RACHEL COATES by her next friend &c. *against* THOMAS HUGHES.

*Philadelphia, Monday, July 22d.*

A subsequent marriage and birth of posthumous or other issue, do not amount by the law of *Pennsylvania* to a total revocation of a will, even where the subsequent issue is the testator's only child. They amount to a revocation *pro tanto*, namely, so far as regards the widow and child, but not as to the appointment of executors, nor as to a power to sell for the payment of debts.

As to personal property, the probate of a will is conclusive while it remains unrevoked; as to realty, it is but *prima facie* evidence. See *Province Laws* 30, act of 1705.

THIS was an ejectment for a messuage and lot in the township of the *Northern Liberties*, which was tried before the Chief Justice at *Nisi Prius* in *January* last.

The material facts were these: *Abraham Coates*, the father of the plaintiff, intermarried with *Frances Miller*, and during her life time, being seised of the premises in the declaration mentioned, he made his last will, dated the 31st of *August* 1797, wherein he devised as follows: The testator in the first place directed that *all his just debts* and funeral expenses *should be duly paid and satisfied* as soon as conveniently could be after his decease. He then gave to his wife *Frances* all his household furniture, plate &c., to his friend *Abia Brown* a lot in *Camden*, and all the rest and residue of his estate real and personal he devised to his brother and sister as tenants in common in fee, with intent that his wife should have one half the income during her natural life, in lieu of dower. He then concluded his will with the following clause: " Item, " I do nominate and appoint my said brother *Jacob Coates*, " and my friends *Abia Brown* and *Thomas Norton*, executors

" of this my last will and testament, and do authorize and " impower them my said executors, and the survivors and " survivor of them, and the executors of such survivor, when " necessary and expedient for the execution of this my will, " to bargain and sell by private or public sale, all or' any of " my messuages lands tenements and real estate, and by pro- " per deeds and assurances in the law, to grant and convey " the same to the purchaser or purchasers thereof, his her or " their heirs and assigns for ever." *Frances Coates* died without issue in the life time of the testator, and on the 4th of *May* 1802 he intermarried with *Jane Hughes*, a daughter of the defendant, and died on the 11th of *February* 1804, leaving her enseint with the plaintiff, who was born on the 29th of *April* following.

The will was proved on the 7th of *March* 1804, and letters testamentary granted to *Jacob Coates*, one of the executors, *Abia Brown* having died before the testator, and *Thomas Norton* having refused to act.

On the 25th of *March* 1807 *Jacob Coates* sold and conveyed the premises to the defendant in fee simple for the consideration of 4000 dollars, that sum being the fair value of the property, and several judgments having been entered against the testator in his life time, and others against his executor, for the discharge of which the sale of this estate was essential. The executor by his account filed in the register's office, and which had been settled by auditors and confirmed by consent by the Orphan's Court in order to found an appeal, stated the amount of the inventory at 311 dollars and 94 cents, the amount with which he charged himself, including the proceeds of sale to the defendant, at 5929 dollars and 12 cents, and the debts which had been paid at 4934 dollars and 16 cents, of which last item the defendant paid 3757 dollars and 67 cents, to be deducted from the purchase money. One of the plaintiff's exceptions to this account was, that the executor could have gotten more money for this estate, and therefore should be charged with more.

The principal question was whether the will of *Abraham Coates* was revoked by the subsequent marriage and birth of issue; and to bring this before the court, a verdict was taken for the plaintiff, subject to the opinion of the court whether upon this evidence she was entitled to recover.

*C. J. Ingersoll* and *Tilghman* for the plaintiff. The transmission of property, arises, in every society, from provisions of positive law. With a wise regard to the feelings of men, that law has permitted testamentary dispositions, with a view in a great measure to facilitate parents in the performance of the duty which binds them to provide for their families; the same law has with equal wisdom adopted certain rules of construction, to prevent these dispositions from interfering with this duty, or with any presumed intention of the testator. Wills are unstable and ambulatory till death. *Gilb. Dev.* 97. Before the statute of frauds they were revocable by parol. 1 *Roll. Abr.* 614. *Brooke* v. *Ward* (*a*), *Cranvel* v. *Sanders* (*b*). They may by acts of the testator be revoked either in part or in whole, expressly or by implication. It is this principle of implied revocation, which prevents a will from riding over the intention of the testator, by operating in a state of circumstances unforeseen, and for which he either neglected or was unable to provide; a state of circumstances in which his will does violence to both parental feelings and the duty of a husband. A condition is annexed to all wills, that if the circumstances of the testator so change, the will shall not stand.

In the present instance we say that the subsequent marriage of *Abraham Coates* and the birth of the plaintiff, amounted to a complete revocation of his will, so as to destroy the power to sell.

The *civil law*, from which we derive the rule, carries this matter very far. Not only the subsequent marriage and birth of issue, but the birth of any, even a posthumous child, after the will, although there were previous children, amounts to a revocation. 3 *Ferrier's Inst.* 106. *lib.* 2. *tit.* 13. 18. 2 *vol.* 366., 1 *Domat. lib.* 2. *tit.* 1. *sec.* 1. *lib.* 4. *tit.* 2. *sec.* 11. *lib.* 3. *tit.* 2. *sec.* 1. *art.* 8., 2 *Domat. lib.* 4. *tit.* 1. *sec.* 3. *art.* 4., 2 *Cochin* 720. *Cic. de Orat.* 69. 102.

The *common law* reluctantly adopted any part of this doctrine; and it has not been definitely settled until modern times. A very early case in which it makes its appearance, is *Forse* v.

(*a*) *Dyer* 310 *b*.          (*b*) *Cro. Jac.* 497.

*Hembling*, (a) where the will of a single woman was held to be revoked by marriage. In 1683 the case of *Overbury* v. *Overbury* (b) decided that the birth of a child was a virtual revocation of a will of *personal* estate. In 1696 it was ruled by a commission of delegates, that a bachelor's will of *personalty* was revoked by a subsequent marriage and the birth of children. *Lugg* v. *Lugg.* (c) In *Brown* v. *Thompson*, (d) 1702, where a bachelor devised his *real estate* to *E. C.* in fee, and afterwards married her, and died leaving her *privement enseint*, it was held to be *no* revocation, although lord keeper *Wright* was of opinion that an alteration of circumstances might in some cases amount to a revocation even as to real estate. Lord *Hardwicke* in *Parsons* v. *Lanoe* (e) 1748, thought that the statute of frauds made a great difference between wills of personalty and of real estate; and though he did not decide, strongly doubted whether subsequent marriage and issue would revoke a will of lands. In *Jackson* v. *Hurlock* (f) a few years after, he was clear that marriage alone would not. He evidently leaned much against this kind of revocation. But notwithstanding his great name, the stubbornness of the common law was fast yielding to the reasonable doctrine of the civil law, and in a few years it was settled upon nearly the basis on which it now stands. In *Christopher* v. *Christopher* (g) in the Exchequer in 1771, a subsequent marriage and the birth of issue were held to revoke a will of lands; and in 1773, in the case of *Spraage* v. *Stone*, (h) the same point was decided by the three chiefs upon appeal from the court of Chancery in *Jamaica* to the King in council; so that it is not at this time of day to be shaken. The cases of *Cook* v. *Oakley* (i) and *Wellington* v. *Wellington*, (k) shew that the most eminent judges came at last to be satisfied with this rule, and probably led the way to it by their occasional *dicta*.

In tracing the progress of this principle from the earliest case down to *Doe* v. *Lancashire*, (l) where it was settled that

(a) 4 *Rep.* 60.
(b) 2 *Show.* 242.
(c) 2 *Salk.* 592. 1 *Lord Raym.* 441. S. C.
(d) 1 *Equ. Abr.* 413.
(e) *Ambler* 557. 1 *Ves.* 190. S. C.
(f) *Ambl.* 495.
(g) 2 *Burr.* 2182. *note.*
(h) *Ambler* 723.
(i) 1 *P. Wms.* 304.
(k) 4 *Burr.* 2165.
(l) 5 *D. and E.* 49.

a posthumous child came as much within it as one born before the testator's death, two remarks cannot be avoided; first, that marriage alone, or the birth of issue alone, or the birth of one child there being a previous child or children, is no revocation; and secondly, that if the will is affected at all, it is revoked in *toto*. *Shepherd* v. *Shepherd* (*a*), *Driver* v. *Standring* (*b*), *Brady* v. *Cubitt* (*c*), *Pow. on Dev.* 554., *Lovelass* 171., *Richardson* 306., 2 *Bl. Comm.* 376.

We come then to the law of *Pennsylvania* of the 19th *April* 1794., 3 *St. Laws* 532., which we conceive has no effect upon the cause. The 23d section enacts " that where any " person, from and after the passing of this act, shall make " his or her last will and testament, and afterwards shall " marry, *or* have a child or children not provided for in any " such will, and die leaving a widow and child, or either " widow or child, although such child or children be born " after the death of their father, every such person, so far as " shall regard the widow, or child or children afterborn, " shall be deemed and construed to die intestate, and such " child or children shall be entitled to such purparts shares " and dividends of the estate real and personal of the de- " ceased, as if he or she had actually died without any will." It then authorizes the Orphan's Court, so far as regards the wife after married, or the child or children after born, to make partition, or where that cannot be done without prejudice to the whole of that part of the estate devised to any child or children, to value, and order the premises to the devisee or devisees, and on his and their refusal, to the children successively, as where a person dies wholly intestate.

This act does not toll the common law for two reasons: it contains no negative words, and it was made not to supersede but to supply the defects of the common law. Nothing can be more clear than that the common law must govern, unless it can be plainly discovered that the act intended to repeal it. What the common law was, was well known at the passing of the act. It did not provide for the case of a subsequent marriage alone, or subsequent issue alone, or issue where there was previous issue. This act does, but it goes no fur-

(*a*) 5 *D. and E.* 49. *note.*        (*b*) 2 *Wils.* 89.        (*c*) *Doug.* 30.

ther. It embraces the case of a man who makes a will and marries *or* has a child or children. It leaves the case of a subsequent marriage and issue, as it stood at common law. It is affirmative as to these cases, it is not negative as to the other. Now the principle of the common law being that the testator did not intend that his will should stand in the event of marriage and issue, it works a total revocation; and therefore if this act, which makes only a partial revocation in certain cases, does not reach a certain other case which is ours, our case must still be as at common law, and therefore a total revocation. In fact the act contemplates the case of somebody to take under the will, together with the child. The child is to take such *purpart* as if the father had died intestate. The Orphan's Court is to make partition and to adjudge it to the devisees and the subsequent child in succession, until some one of them will accept. This cannot be, where, as in the present case, nobody is to take under the will, and therefore it does not apply to the present case.

It must be agreed that none of the bequests in this will can stand; then why the power to sell? If it stands, it must be upon the ground of intention; whereas the argument for it is upon the ground of expediency. There is no magic in the authority to sell and pay debts. It is of more importance in England than it is here, where we may resort to an Orphan's Court. Yet if such a clause is inserted in a will of lands in *England*, that authority is revoked as well as all others. In *Spraage* v. *Stone* there was an order to the executors to sell negroes and stock, and to pay debts, yet the whole will was revoked; and in *Wellington* v. *Wellington*, where there was a trust to pay debts out of the rents and profits, which is highly favoured in that country, it was not thought to make any difference.

There is no hardship. The defendant had full notice of all the facts. But nevertheless we are willing to pay for improvements and the first cost.

*Sergeant* and *Rawle* for the defendant. It is of no importance to the plaintiff whether she recovers or not, because the estate must still go to pay the testator's debts; but it will be a loss to the defendant of his trouble and the rise in value.

1811.

COATES
v.
HUGHES.

Be this however as it may, we contend 1. That the plaintiff can never recover. 2. That she cannot recover while the probate of this will is unrepealed.

1. The will contains certain provisions which are at an end, and others which are in force, that is to say, others which are perfectly appropriate to the existing state of things,—as the payment of debts, and the power to sell for that purpose; and taking the act of 1794 in connexion with the legal history of the state as it relates to the payment of debts, it will appear very obvious, that the legislature intended that there should be no revocation of such a power in consequence of subsequent marriage and issue.

The act of assembly, though it has no negative words, implies a negative. It provides for every case at the common law, and for more. It embraces this very case of a man's dying and leaving a widow *and* child not provided for in his will; and declares the whole effect of it to be, that *so far* as shall regard the widow or child after born, he shall be deemed to have died intestate. It is not possible to imply more clearly that the intestacy shall go no further. It does not revoke a devise for the payment of debts, an appointment of executors, or any powers whatever, except such as would have a tendency to diminish a child's or widow's share. It merely gives a widow or child the same share as in case of intestacy, which is what remains after payment of debts. It is contrary to the spirit of all the laws of *Pennsylvania*, to consider a testator as having a right to dispose of any part of his estate to children or widow, but what remains after payment of debts; and of course it must be contrary to the spirit of those laws to revoke a devise or power for the payment of debts, when its object is only to give the benefit of intestate succession to an afterborn child.

That a child's share is what remains after payment of debts, is clear from a review of the acts of assembly.

The first proprietary began with a provision to this effect among the laws agreed upon in England. " All lands and " goods shall be liable to pay debts, except where there is " legal issue, and then all the goods, and one third of the " land only." *Prov. Laws, App.* 4. In 1682 the portion made liable to debts in case of issue, was increased to one half,

if the land was bought before the debts were contracted. *App.* 7. And finally in 1688 all lands were made liable to debts, by an act of that date. *App.* 10. The first law disposing of the estates of deceased persons, was passed in 1683; it gave one third to the wife of the party, one third to his children equally, and the other third " as he pleased," *his debts being first paid. App.* 9. It was followed by a law in 1693, which after exposing all the lands of the decedent to his debts, and appointing the order of payment, directed that " the surplusage or residue if any be of the testator's person- " al estate, shall be distributed by the executors according to " their last wills; and *if* the testator's personal estate shall be " sufficient to pay the debts, then the real estate shall remain " as their last wills devise the same." *App.* 13. This act was supplied by a similar one passed in 1700. *App.* 16. In 1705 the legislature in a general law for the settlement of intestate's estates, order a distribution only of the *surplusage*, " after debts funeral and just expenses of every sort " paid;" *Prov. Laws* 33.; and the same terms are used in the act of 1711. 1 *St. Laws, App.* 43.

Such was the situation of our code, when the first law relating to the particular question in this case, was passed in 1764. 1 *St. Laws App.* 47. The terms of the 5th section of it are the same as those of the 23d in the *Act* of 1794, except that the first act has a retroactive effect to the 4th of *February* 1748; and both it and the existing law which supplied its place, acknowledge in the strongest terms the lien of debts upon real estate, and limit by the plainest implication the testator's power over it to the surplusage after debts paid. It is therefore this surplusage that the legislature had in view when securing the interest of the afterborn child or widow. The appointment of an executor, and an authority to sell for the payment of debts, cannot be affected. It is the view of the legislature to confirm rather than defeat them, to adopt the testator's agent rather than an administrator, to have the debts satisfied through the medium of the testator's appointment, rather than by an application to the Orphan's Court, or a sheriff's sale. They have shewn a particular regard for this testamentary power to executors, by transferring it even

to the administrator with the will annexed. *Act of* 12th *March* 1804. 4 *St. Laws* 593.

There can be no doubt that where children are born before as well as after, the power of the executor will remain as to the former. It would be very pernicious if it ceased to exist as to the others.

The transaction has been perfectly fair, the property has brought its full value, and it has been applied to the payment of debts. Under such circumstances, though the power were defective or defectively executed, this court would support it for the sake of creditors, if not of the purchaser. *Pollard* v. *Greenville* (a), *Hannum* v. *Spear* (b), *Graff* v. *Smith* (c). The plaintiff herself affirms it, by claiming the benefit of the sale, and what more the executor could have obtained.

2. If however the will is totally revoked, still this suit is premature, while the letters testamentary remain in force. The will must be revoked, before an ejectment can be maintained for land devised by it. There is a difference between the law of *Pennsylvania* and of *England*. There a will is proved in the ecclesiastical court, merely as to personalty; as to real estate it can only be done in an adversary suit at law, or in equity, and then *pro hac vice*. Here the probate of both is before the same officer, and the effect given to them must be the same. In *England* and in *Pennsylvania* a probate as to personal estate is conclusive; it must be the same as to a will of lands. [TILGHMAN C. J. Has not the contrary been the practice? YEATES J. It has been held that as to personalty the probate is conclusive; as to realty it is only *prima facie*.] The inconveniencies of such a distinction would be very great. Very slight evidence will put the devisee to the whole proof again, even after an issue of *devisavit vel non*. [The Chief Justice said he thought that the probate had been held to be not conclusive in the case of one *Flower's* will, and that he would during the adjournment examine the notes of the late Judge *Smith* for some other cases. Accordingly on the next day, he told the counsel that the law had been settled in *Vangordon* v. *Vangordon*, where the probate was

(a) 1 *Cha. Ca.* 10.    (b) 2 *Dall.* 291.    (c) 1 *Dall.* 481.

held to be but *prima facie* evidence. The point was of course no further pressed.]

TILGHMAN C. J. *Abraham Coates*, the father of the plaintiff, made a will during the life of his first wife, by which he disposed of all his real and personal estate, and having ordered his debts &c. to be paid, he gave power to his executors to sell any part of his estate when necessary and expedient for the execution of his will. The first wife died, having never had issue. Afterwards, the testator married a second wife, the mother of the plaintiff, and died leaving his wife *enseint*. The plaintiff was born about two months after her father's death. The question is, whether in consequence of these circumstances the will was revoked *in toto*, or only so far as related to the interest of the *plaintiff and her mother* in the estate of *Abraham Coates*.

Marriage and the birth of a child, both subsequent to the making of a man's will, are circumstances by which his situation is so completely altered, that it cannot reasonably be supposed he intended the will to remain in force. Such was the presumption of the *civil law;* but it was long before the same principle was ingrafted on the common law. *The lawyers* and the *people* of *England* have always shewn a marked jealousy both of the *principles* and *practice* of the civil law. But by degrees, in cases where the civil law is clearly right, jealousy gives way to good sense and justice. First of all it was agreed, that subsequent marriage and issue should operate as an implied revocation of a will of *personal* estate. As cases occurred, which turned the minds of the judges to this subject, it was perceived there was no solid ground for a distinction between *real and personal* estate. At length it was settled in the cases of *Christopher* v. *Christopher*, decided in 1771, and *Spraage* v. *Stone*, decided in 1773, that a subsequent marriage and issue should be an implied revocation of a will of *land*. Prior to this, in the year 1764, the legislature of *Pennsylvania* being struck, in consequence of an event which took place in the city of *Philadelphia*, with the imperfection of the common law as then understood, made a provision for all cases which could occur under a subsequent marriage. The act of 1764 has been repealed, but it is unne-

cessary to say more of it, as it was in substance reenacted by the act of 19th *April* 1794, sect. 23, which is as follows,— " Where any person shall make his last will, and afterwards " *marry*, or have a *child* or *children* not provided for in such " will, and die leaving a *widow and child, or either widow or* " *child*, although such child or children be born after the " death of their father, every such person, *so far as shall re-* " *gard the widow or child or children after born*, shall be " deemed and construed to die intestate, and such child or " children shall be entitled to such purparts, shares, and divi- " dends of the estate real and personal of the deceased, as " if he or she had actually died without any will &c." The case before us is comprehended in this act, and upon a literal construction the testator is to be considered as dying intes- tate, so far as regards the widow and child, and no further. But the counsel for the plaintiff insist on the will's being void *in toto.* The act of assembly, say they, is affirmative, and therefore does not interfere with the provision of the com- mon law. That indeed is the point on which this cause turns. The common law must govern, unless it can be fairly inferred from the act of assembly, that it ought not to go- vern. It appears to me, that it was the intention of this act to make a *complete provision* for the case in question, and that the common law has no room for operation. Here is a marriage and a child born, subsequent to the will. In such case, says the act, the testator shall be deemed to die intes- tate, so far as shall regard the widow and child. Although not expressed, it is necessarily implied, that the intestacy shall go no further. Why should it? The will may contain very useful provisions, not interfering with the interest of the wi- dow and child. The case before us shews it. By our law land is subject to the payment of debts. The management of the sale of the land is a matter of importance. Much de- pends on the integrity and ability of the person to whom this trust is committed. The testator having made a selection of a trustee from his own personal knowledge and experience, what good reason can be assigned for substituting another in his place, especially as such substitution must be attended with additional expense? But this is not the only point of view in which the subject is to be considered. We are now

about to establish a general rule, which will extend to all cases in which the common law revokes a will in consequence of marriage and issue. A will may contain other useful provisions, besides a power to sell for payment of debts. It may authorize an executor to execute conveyances, and carry into effect contracts made by the testator in his life time. The testator may have been himself the executor of some other person, and the executor appointed by him will succeed to his trust. But if the will is void *in toto*, this succession will be destroyed. The act of assembly seems therefore to have made a *better* provision than the common law. At all events it is a *different* provision, and therefore by necessary implication the common law is taken away.

But it has been contended, that the only case in which the act leaves *part* of the will in force, is where part of the estate is devised to *children*. This argument is founded on a subsequent part of the 23d section which I have not yet mentioned. I think it is too much strained. The part of the act alluded to makes provision for *partition* to be made by order of the Orphan's Court. That this power *to make partition is* confined to cases where part of the estate is devised to children, may be true; but to say that the act makes *no provision for any other case*, is begging the question in dispute, and is contradicted by the former part of this section, which makes complete provision in other cases.

Upon the whole, I am of opinion that the will of *Abraham Coates* was not revoked *in toto*, but remained in force so far as related to the appointment of executors, and the power given them to sell the lands for payment of debts.

YEATES J. I consider the present case as governed by the provisions of the 23d section of the act of assembly passed on the 19th *April* 1794, 3 *Dall. St. Laws* 532., and to fall within the express words of that law. *Abraham Coates* made his will in 1797, after the passing of the act, and died leaving a widow to whom he was married in 1802, and a child born after his death, who of course were not provided for in his will. So far as regards his widow and child, he must be deemed to have died intestate; and the plaintiff his child was intitled to such share of his estate real and personal, as if he had actually died without any will.

It cannot be denied, that the inconveniences resulting from the state of the common law, produced this section of the act of *April* 1794. Marriage alone and birth of children alone, were not sufficient to operate the revocation of a previous will; and however strongly the inclination of the courts was with the children, they held that they could not set aside a solemn will, because some of the children were left unprovided for. 5 *T. R.* 54. *note.*, 4 *Bur.* 2171. 2182. It is obvious, that the legal presumption arising on an alteration of circumstances not contemplated by the testator, that such was not his will, and that he would have made a very different testament if he had not been prevented by accident or ignorance, must in many instances have disappointed his real intentions, when those events have been construed to amount to a total revocation of his will. The legislature by their act of 23d *March* 1764, 1 *Dall. St. Laws, App.* 48. *s. 5.* pursued a juster system, and better calculated to carry into execution, what might reasonably be supposed to be the dictates of an honest mind. " So far as shall regard the widow, " or child or children afterborn, the party shall be deemed " and construed to die intestate." So forcibly were the lawmakers struck with the propriety of this provision, that they give it a retrospective operation as to all wills made from and after the 4th day of *February* 1748. The 23d section of the law of 1794 agrees substantially with the 5th section of the law of 1764, except that the words of the law now in force are more minute and particular.

But it has been contended, that the present case is not embraced by this law, which only respects cases where other children share with the afterborn child; and that this is manifested by the powers granted to the Orphan's Court in the concluding terms of the section. It is said to contemplate the case of a child as devisee under the will, and that the expressions " *such* part of the estate as cannot be divided" &c. refer to other shares; and that though it goes further than the common law does, as in the instance of a widow alone surviving her husband, yet in the case of a widow and child surviving the common law still remains, the act of assembly implying no negative therein.

To this it is properly answered, that the principal case

falls within the terms of the preceding part of the section, and the powers delegated to the judges of the Orphan's Courts do not derogate from this exposition thereof. If only the child born after the making of the will survives the parent, the whole of the real and personal estate descends to such child, after payment of debts and funeral expenses, without any order of the Orphan's Court. If the widow and the child survive, then partition may be made between them of the lands agreeably to the 22d section of the act on a petition presented to the Orphan's Court. If the lands are devised to a child, then partition may be made between such child and the issue born after making the will; or the premises may be valued, in case partition cannot be made without prejudice to or spoiling the whole of that part of the estate devised to such child. It is perfectly clear, that the case before the court is within the reason and spirit of the law; and it is equally clear from our whole system of laws, as well as from the third section of the act under consideration, that heirs can only take under the ancestor the remainder of his estate real and personal, after payment of his debts.

Marriage after the making of a will, or leaving a child born subsequent thereto and not provided for therein, is only a revocation *pro tanto*, so far as the widow and child are interested, under the plain meaning of our act of assembly; but by the common law, marriage and the birth of a child subsequent to the will operate as an entire and total revocation thereof. This forms a strong distinguishing feature between the two codes. In the view which I have taken of the subject, I conceive that the appointment of executors would remain in full force, notwithstanding the subsequent marriage and having issue; and that a power granted to the executors to sell the real estate, would continue unrevoked, provided such sale did not injuriously affect the interests of the widow or child, as to their purparts shares and dividends of the estate real and personal of the deceased.

Here the creditors of *Abraham Coates* were pressing for their demands, and some of them had even proceeded to judgment against him in his life time, and against his executors after his death. The personal estate was inadequate to the discharge of the debts. To effect this object, one of three

modes must necessarily have been recurred to; a sale of the lands by the sheriff, or by an administrator raised up for that purpose under an order of Orphan's Court, or by the executors named in the will. The last measure has been adopted; and after every prudent precaution had been used to insure a fair price for the lands by public advertisement in 1805, the same were sold and conveyed to the defendant for 4000 dollars, their full value, on the 25th *March* 1807. It was proved on the trial that 3750 dollars has been expended in payment of the debts of *Abraham Coates*, and that several debts still remain unpaid. The defendant has made some small improvement on the land. The plaintiff's counsel declare their willingness to be subjected to such terms, as the court may impose in favour of creditors, but at the same time insist that their client should have the benefit of the increased value of the property. Their claim in this particular in my idea, can rest on no other equitable grounds, than that the creditors were willing to wait for payment of their demands, which is contradicted by the evidence exhibited on the trial. If the land had not been sold by the executor, it must unavoidably have been sold by the sheriff at an increased expense, and most probably it would have been struck off at an inferior price.

I scarcely need subjoin, that the tenth exception taken to the administration account exhibited by the executor, which is now pending in this court by appeal from the Orphan's Court, that the land was not sold at a full and fair price, is directly opposed to the recovery of the land itself.

On the whole, I am of opinion with the defendant on the reserved point.

BRACKENRIDGE J. " A will may be revoked either abso-
" lutely or conditionally, in all or in part; and if it be revoked
" only in part, the rest will stand." *Powel on Devises* 614.
This is with respect to a particular devise in a will; as in the case of a devise in fee to *A*, and afterwards a mortgage of the premises to *B*, it is a revocation of the devise to *A*, so far as to subject it to the mortgage. And " revocations *pro*
" *tanto* may affect it, either by altering the quality of the
" estate, in abridging the *interest in*, or diminishing the

"*quantity* of the thing devised." *Id.* 623. Carry this principle out, and what hinders a revocation of the whole devise to one, and yet the will stand as to devises to others? What is in the way of a revocation of every devise, and yet the will stand as to some purposes, such as *the appointment of executors?* I can see nothing, and will so hold it. The administration of the personal estate, the sale of lands for the payment of debts, may be, and is in most cases, a great object. It is a matter of moment that there be a power to sell lands and pay debts in the first instance, to save the expense of process, or application to an Orphan's Court; and why supersede the commission of appointment, if it may be so called, by the testator himself, in the constituting his executors? I can see no necessity for it; but that this power may stand, even though every other part of the will be set aside.

The act of assembly itself of the 19th *April* 1794 evidently looks to a *setting aside in part.* The words, " *so far as shall* " *regard &c. shall be deemed and construed to die intestate,*" imply a partial avoiding of the will, and not a total revocation.

This being the only point in the case which appears to me to have remained to be settled, I shall say nothing of the question as to a man's being married when he makes his will, and not a bachelor, and afterwards marrying and having a child; for *the reason* is the same in both cases, and *the law* must be the same. It has already been decided in the *English* books. Nor, were it the case of a married man having children, and making his will and dying, and one after born of whose existence he could not be supposed to have had a knowledge before his death, would there be any difference, there being the same reason. The revocation, or rather the annulling, avoiding, or setting aside, in these cases, is *by operation of law;* but need be carried no farther than *quoad hoc,* unless the case should be such, that the avoiding one part must in the nature of it avoid the whole, of which I cannot conceive an instance at this moment of my recollection, *I take every will to be subject to such a disposition of the law* in favour of humanity, that *in a case where the testator was under a natural and moral obligation to provide for his offspring, whose existence he did not know, the law will do it*

Vol. III.　　　3 T

1811.

COATES
*v.*
HUGHES.

*for him;* though had he known of the existence, the common law would not go so far as the civil law, and set aside an inofficious testament. This goes on the idea, that he must be supposed tacitly to have annexed a condition to his dispositions, that these shall stand, provided no such change happens in the relations of his duty as shall call for a different distribution. In the case before us I think the sale good, there being *no fraud in fact* in the consideration of the purchase, and the object of making sale being honest, and what the law would in another way have compelled, *the payment of debts.* Nor, strictly taken, do I think the sale void, taking into view the person of the vendor or vendee, when it is to supersede what has been done for the good of all concerned at the time of the transaction; it being the mere accidental rise in the value of property subsequent to the sale, that has given rise to the wish of avoiding it. I think the unfairness and dishonesty are all on the other side, if there is any on either side, and are not to be favoured.

Judgment for defendant.